## No. 5926.

## WILLIAM WASHINGTON v. THE STATE.

1. PRACTICE—CHARGE OF THE COURT—NEW TRIAL.—To entitle a party to a new trial for a supposed error in the charge, no exception having been reserved, it must appear that the court "has misdirected the jury as to the law, or has committed any other material error calculated to injure the rights of the defendant."

2. SAME—MURDER UPON EXPRESS MALICE AND IN THE PERPETRATION OF RAPE.—No question of degree can, enter into a murder perpetrated in the commission of the offense of rape. The fact that it was perpetrated in the commission of rape is of itself evidence that it was murder upon express malice aforethought. The indictment in this case charges a murder upon express malice aforethought and that it was committed in the perpetration of rape. The trial court charged the jury correctly upon murder committed with express malice aforethought, but omitted to charge upon murder committed in the perpetration of rape. *Held*, that in the absence of exception or requested instructions upon the subject, the omission was not error, no prejudice to appellant appearing.

3. SAME—FACT CASE.—See the statement of the case for evidence *held* sufficient to support a capital conviction for murder.

APPEAL from the District Court of Colorado. Tried below before the Hon. George McCormick.

The appellant was convicted in the first degree, and the death penalty was assessed against him, for the murder of Mary Miller, in Colorado county, Texas, on the twenty-seventh day of December, 1887.

John Miller was the first witness for the State. He testified that he was the husband of Mary Miller, the deceased. One of the daughters of Mr. Somerlotte, who lived in the same neighborhood that witness did, got married on the night of December 27, 1887, and that event was celebrated with a ball at Mr. Somerlotte's house. The witness was employed as one of the musicians to perform for the dancers, and left home to go to Mr. Somerlotte's, a short while after sun down. He left at his home his wife, the deceased, and his two small children, one four and the other two years old. Witness saw the defendant at Mr. Somerlotte's a little after dark. He saw him there again a little after one o'clock, and again a little after daylight, which was

shortly before the ball broke up. Witness left Somerlotte's and went home as soon as the ball broke up. Going into his house, on his arrival, he found his two children asleep in bed, but did not find his wife. He then observed that a chair and bench in the front room were overturned, and discovered blood on the floor of that room, a trail of blood leading from the front to the back room, and some blood on the door of the back room. He then went to his horse lot and found therein the dead body of his wife. She lay on her back, robed in her night clothes, which were pulled up to her waist, with her throat cut from ear to ear. There were several other wounds on her face and person, and her feet and legs were lying apart. There were two impressions of feet on the ground between and a few inches from her feet. On the floor of the front room the witness found the cuff button which is now in evidence. That button was a counterpart in every respect of a pair of cuff buttons owned and worn by the defendant when, some time before the murder, he lived at the witness's house. The witness also discovered that his trunk, which he kept in his house locked, had been broken open, and that about twelve dollars in money, which he had in a pocket book in that trunk, had been taken. The pocket book was not removed.

Having made these discoveries, and observing the careful watch kept over the dead body of his wife by his faithful dog, the witness pulled the clothes down over the limbs of his wife and went to the house of Mr. Charles Aschenbeck, about a half a mile distant, for assistance, sending thence for Mr. Somerlotte and other neighbors. The defendant at that time was living at Mr. Aschenbeck's house. Upon examination of his premises, the witness discovered the barefooted tracks of a person going from the back door to the lot, and also the tracks of a person with shoes on going around the house from the front door to the lot. These tracks showed that the persons were running when they were made. Ten of the twelve dollars which witness had in his pocket book in his purse when he left home on the night of the murder were in a single gold piece, and the balance was silver. There was blood on both the outside and inside of the purse. Witness gave the purse to Mr. Leyendecker at the inquest. It was the purse in evidence.

Charles Aschenbeck testified, for the State, that John Miller came to his house early in the morning of December 28, 1887, and informed him that when he, John Miller, got home on that

morning from the ball at Mr. Somerlotte's, he found his wife, Mary Miller, dead in his horse lot. Witness then went to Mr. Somerlotte's house to get him to go to Miller's house, and thence he went to Miller's and found the dead body of Mrs. Miller in the horse lot. She lay on her back, with her head in a pool of blood. Her throat was cut from ear to ear, and there were other wounds on her face and neck. Witness attended the ball at Mr. Somerlotte's house on the night of the tragedy, and saw the defendant there a little after dark. Defendant then had on a pair of light gray pants. The defendant moved to the witness's house from John Miller's house about two months before the murder, and was living at witness's house, occupying an up stairs room, when the murder was committed. Before going to Miller's house, after being informed of the murder of Mrs. Miller, the witness went to the house of, and summoned, Mr. J. F. Leyendecker, the justice of the peace of the precinct. En route from Leyendecker's to Miller's, the witness went by his (witness's) home, and, as he approached his house, he saw the defendant, dressed in a black suit of clothes, going off through the horse lot. That was the last he saw of defendant until after his arrest. After the killing of the deceased, and after defendant left the neighborhood, the witness went into the upstairs room occupied by the defendant, and found the gray pants and the two pocket knives now exhibited in evidence. The pants were bloody when witness found them, and were still bloody. He knew as a fact that that pair of pants belonged to the defendant, and that the defendant had them on a short while after dark on the night of the murder. The two pocket knives were in the pocket of the pants when witness found them. They were bloody when found and were still bloody. John Miller showed to the witness the cuff button which is now in evidence, and said that he found it on the floor in his house. Witness had seen the defendant in possession of a pair of cuff buttons similar to the button in evidence. When witness first saw the body of Mary Miller, it was lying on the back, the feet and legs apart. Two toe impressions of boots or shoes were still on the ground between the feet of the deceased. The said impressions were close together.

Mrs. Josephine Dungen testified, for the State, that she went to John Miller's house on the morning of December 28, 1887, and saw the dead body of Mrs. Mary Miller in the horse lot. She afterwards assisted in washing and dressing the body, and saw

that, besides the bruise on the forehead, which appeared to have been inflicted with a blunt instrument, the throat had been cut from the right of the wind pipe to the left ear, the wind pipe being severed. The right eye and the mouth were also bruised. There was also a bruise on the left breast and arm, and several smaller bruises about the face. There was blood near the groin which showed the print of fingers, and a bruised place on the left shin. The front part of the night gown was very bloody.

Sheriff J. L. Townsend testified, for the State, that he was notified of the murder of Mrs. Miller, and at once, accompanied by Messrs. Crawford and Ordner, repaired to Miller's house and obtained all the information accessible. Mr. Aschenbeck pointed out to witness the way defendant had gone. Witness and his deputies then took the trail and traced defendant through Aschenbeck's field up Cummings creek to the point where he crossed the creek, and thence they went to the house of the defendant's aunt in Austin county. Crawford and Ordner got off their horses and started to the house while the witness, remaining on his horse, rode around the house to the rear. Just as Crawford and Ordner reached the front of the house, the defendant emerged from the rear and fled. Witness, on horseback, and Crawford and Ordner, on foot, pursued him. Witness finally overtook and arrested him. Defendant was then examined, and blood was found on the sleeves of his undershirt. Defendant began to talk, and witness told him to make no statement unless he wanted to, as any statement he might make about the matter could and doubtless would be used in evidence against him, and could not be used for him. The defendant, however, persisted, and made in substance the following statement: "Miller owed me some money and his wife would not let him pay it, and I got mad and killed her for it. I went to Somerlotte's house and saw Miller there playing the accordeon. I then went to Miller's house, stood on the gallery, looked through the window and watched Mrs. Miller put the children to bed and undress herself. She then came to the door and looked out, and as she turned I caught her and asked her to give me some. She refused and got away from me, and I cut her once in the house. She went out at the back door and I went out at the front door, and caught her in the lot. Then I threw her down and killed her and then I did what I wanted to. I then went into the house, opened the trunk and got the money out of a purse which was in the trunk."

When arrested, the defendant had in his possession an accordeon for which he said he had that morning paid eight dollars. Defendant told witness that he left the pants he wore at the time of the murder in his room at Aschenbeck's house, and that the shirt he had on at the time would be found in the same room wrapped up in the bed clothes. Witness sent Ordner to that room to get the shirt, and Ordner brought to the witness the bloody shirt which was now in evidence. Justice of the Peace Leyendecker gave the witness the pair of gray pants, the two pocket knives, the purse and the cuff button, which were now in evidence. When arrested, the defendant told the witness that he spent the ten dollar gold piece he got from Miller's house for the accordeon and some other articles. He told witness where and from whom he bought the accordeon, and witness sent Ordner with the accordeon to that person, and Ordner returned to witness with the ten dollar gold piece. The arrest of defendant was made about twenty miles from Miller's house.

J. F. Leyendecker testified, for the State, that he was justice of the peace of Colorado county. On the morning of December 28, 1887, he was notified of the murder on the night before of Mrs. Mary Miller. He went at once to John Miller's house and found the dead body of Mary Miller lying, back down, in the horse lot, mutilated in the manner described by previous witnesses. The legs of the dead woman were lying apart, and witness noticed two impressions of the toe of a boot or shoe between the feet of the deceased. Mr. Charles Aschenbeck at that time gave witness the pair of gray pants and the two pocket knives which are in evidence, and which at that time, as now, were bloody. John Miller then gave the witness the cuff button which is now in eviednce. Witness saw blood on the floor of the front room of Miller's house, and blood leading from the front to the back room, and blood on the horse lot gate. He also discovered bare footed tracks leading from the back door to the horse lot, and boot or shoe tracks leading from the front door to the horse lot. Sheriff Townsend and deputy sheriffs Crawford and Ordner brought the defendant to witness's office on the day after the murder, when the witness held the examining trial of the defendant. Witness there and then told defendant that it was optional with him to make a statement or not, but that if he made it he must understand that everything he said could, and would in all probability, be used against him in evidence on his trial, and could not, and would not, be admitted

in his behalf.  Defendant unquestionably understood and com-
prehended the warning thus given.  He insisted, however,
on making a statement, and made it as follows: "I went to the
dance at Somerlotte's, and saw John Miller there playing the
accordeon.  I then left and went to Miller's house, stepped on the
gallery, looked through the window and saw Mrs. Miller put her
children to bed.  She then opened her door and looked out, and
when she went back I went in, caught her and asked her to give
me some.  She then tried to get away from me.  I then cut her
and she ran out at the back door.  I went out at the front door
to cut her off from the gate.  I then ran around the house and
caught her in the lot, threw her down and killed her, and did
what I wanted to.  I used two knives."

Constable William Ordner testified, for the State, that he was
with Sheriff Townsend and Crawford when the defendant was
arrested, and heard defendant, after being warned by Town-
send, make the statement detailed by Townsend in his testi-
mony.  Townsend sent witness with the accordeon taken from
the defendant to the person from whom defendant said that he
purchased it, and witness delivered the accordeon to that person
and received from him a ten dollar gold piece, which he, wit.
ness, delivered to Townsend.  Defendant told Townsend that
the shirt he had on when he committed the murder was wrapped
up in the bed clothes in his room in Aschenbeck's house.  Wit-
ness went to that room and found the bloody shirt in evidence,
wrapped up in bed clothes as stated by defendant, and gave it
to Townsend.

George B. Crawford testified, for the State, that he was with
Townsend and Ordner when defendant was arrested, and he de-
tailed the occurrances at that time substantially as did the wit-
ness Townsend.

The defense introduced no testimony.

No brief for the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE.  In the indictment it was charged
that the murder of Mary Miller by this appellant was committed
with express malice aforethought and in perpetration of
the crime of rape.  These allegations were most abund-
antly and conclusively sustained by the evidence adduced on

the trial.   There can be no reasonable doubt of the fact, in the light of the evidence, consisting in part of two separate confessions, made after he was warned, by defendant himself, of his guilt, and the horrible and sickening details of his atrocious crime.

There are no bills of exception in the record; no objection was made to the charge of the court when delivered to the jury, and no additional instructions were asked for the defendant. The charge was full, correct and sufficient, in so far as it presented the law applicable to a murder committed with express malice aforethought.

In the motion for a new trial it was for the first time objected to the charge that it failed and omitted to instruct the jury also upon the law with reference to a murder committed in the perpetration of rape.   To entitle a party to a new trial for supposed errors in the charge, it must be made to appear that the court "has misdirected the jury as to the law, or has committed any other material error calculated to injure the rights of the defendant." (Code Crim. Proc., art. 777, subdiv. 2; Bishop v. The State, 43 Texas, 390; Leache v. The State, 22 Texas Ct. App., 280, where the later decisions are cited; Jackson v. The State, Id., 442; Williams v. The State, 24 Texas Ct. App., 17.)   In this case there was no apparent misdirection in so far as the charge goes, and it only remains to inquire whether the omission or failure to instruct upon the law with reference to murder when committed in the perpetration of rape, has injured the rights of this appellant?   How such a result could be possible under the facts of this case we can not imagine.

To constitute murder of the first degree there must be "malice aforethought," "express malice," and when this malice aforethought is evidenced by the fact that crime was committed in the perpetration of rape, then there can be no question of degrees in such murder; it is ipso facto murder of the first degree, and made so by the statute.   (Penal Code, art. 606.) But a murder committed in the perpetration of rape or any of the other enumerated felonies in article 606 is none the less a murder upon malice aforethought, and where one of these modes is named in the indictment, whilst it may be essential to prove it as charged, the proof when made is but evidence of the malice aforethought which is the controlling constituent element of the crime. .(Tooney v. The State, 5 Texas Ct. App., 163; Roach v. The State, 8 Texas Ct. App., 478; Sharpe v. The State, 17 Texas Ct. App.,

486; Gonzales v. The State, 19 Texas Ct. App., 384; State v. Schnelle, 24 West Virginia, 767; Newcombe v. The State, 37 Mississippi, 383.)

As stated heretofore, there was no exception to the charge as given, and no additional instructions were asked, and we can not see how the defendant could have been injured by the court's simply limiting the finding of the jury to a murder committed upon express malice. The facts showing both express malice and a murder also in the perpetration of rape, the failure to charge upon the latter, instead of being an injury to defendant, if it could have had any effect at all, it appears to us, could only have been favorable to the defendant. We do not think the omission, complained of for the first time upon the motion for a new trial, shows under the circumstances of this case such error as requires a reversal of the judgment. This is the only question of any moment presented upon the record on this appeal.

Two confessions made by appellant show him to be guilty of one of the most atrocious murders ever perpetrated in this or any other civilized country, and when the sickening details are considered, we can but admire the fortitude and forbearance of the community where it occurred in permitting the law to vindicate itself in his punishment with its own extreme penalty.

The judgment is affirmed.

*Affirmed.*